THE HONORABLE JOHN C. COUGHENOUR

1
2
3
4
5
6
7
8
9
10
11
12
13
14

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

GREGORY MARK MOLLEY,

Defendant.

CASE NO. CR15-0254-JCC

ORDER

15   This matter comes before the Court on Defendant Gregory Mark Molley's motion for

16  compassionate release (Dkt. No. 77). Having considered the parties' briefing and the relevant

17  record, the Court hereby DENIES the motion for the reasons explained herein.

18  **I.    BACKGROUND**

19   On May 13, 2014, Molley's then-wife, Johna Shepherd, contacted the King County

20  Sheriff's Office to report that her residence had received a suspicious package. (Dkt. No. 40 at

21  3.) The package, which was addressed to Molley's 15-year-old step-daughter, contained sexually

22  explicit items from a retail store that sells erotic clothing, videos, and sexual products. (*Id.*)

23  Shepard believed that those items had been fraudulently purchased by someone using her

24  daughter's credit card. (*Id.*)

25   The King County Sherriff's Office researched the purchase and informed Shepard that it

26  was made through an IP address assigned to her home. (*Id.* at 4.) This information led Shepard to

suspect that her husband had purchased the package. (*Id.*) To confirm her suspicion, Shepard searched the laptop in her home's office. (*Id.*) The laptop contained nude photographs of her daughter and her daughter's female friends. (*Id.*)

Shepard immediately informed the police of what she had found. (*Id.*) Based on that information, King County detectives obtained a search warrant for Molley's home. (*Id.*) The search revealed that Molley had secretly recorded his step-daughter and her female friends since 2012, when the girls were approximately 14 years old. (*Id.*) Molley made the recordings by setting up various "spy" cameras throughout the house. (*Id.*) One camera was disguised as a remote car key fob. (*Id.*) Another was disguised as a small face clock, which Molley placed in the bathroom where the girls showered. (*Id.*)

On July 20, 2015, the police arrested Molley as he returned from a business trip. (*Id.*) During that arrest, the police seized several electronic storage devices from Molley's luggage. (*Id.*) The storage devices contained 669 explicit images and videos of Molley's step daughter and two of her friends. (*Id.*) Many of the videos had been labeled to identify the victim by their initials, the location where the video was filmed, and the video's explicit nature. (*Id.*)

Following a detention hearing, Molley was released on home detention pending trial. (Dkt. No. 17.) On December 18, 2015, Molley pleaded guilty to receipt of child pornography. (Dkt. No. 33 at 2.) On March 29, 2016, the Court sentenced Molley to 84 months in prison. (Dkt. No. 58.) Molley is presently incarcerated at FCI-Lompoc, a prison that has suffered perhaps the worst COVID-19 outbreak of any federal prison. *See COVID-19 Cases*, Bureau of Prisons, https://www.bop.gov/coronavirus/index.jsp (last visited June 26, 2020).

On April 21, 2020, Molley asked the Bureau of Prisons to move for compassionate release on his behalf. (Dkt. No. 77-2 at 1.) Molley argued that he should be released because his age, weight, hypertension, and high cholesterol put him at greater risk for severe complications from COVID-19. (*Id.*) Eight days later, Molley tested positive for COVID-19. (Dkt. No. 78 at 83.) Fortunately, Molley never showed any symptoms of COVID-19, and an X-ray of Molley's

lungs revealed only "minimal scarring or atelectasis at the base of the lingua." (*See id.* at 77–78, 89.) Molley now moves for compassionate release. (Dkt. No. 77.)

## II.    DISCUSSION

### A.    Legal Standard for Compassionate Release

18 U.S.C. § 3582(c)(1)(A) allows a court to reduce a term of imprisonment if "extraordinary and compelling reasons warrant such a reduction" and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." The Sentencing Commission's relevant policy statement, in turn, says that a court may reduce a term of imprisonment if "the defendant is not a danger to the safety of any other person or to the community" and "extraordinary and compelling reasons warrant such a reduction." United States Sentencing Guidelines ("USSG") § 1B1.13. The policy statement also directs a court to consider the factors set forth in 18 U.S.C. § 3553(a) in deciding whether compassionate release is appropriate. USSG § 1B1.13 cmt. n.4. Taken together, the policy statement and 18 U.S.C. § 3582(c)(1)(A) create a three-step process for ruling on a motion for compassionate release: the court must first decide whether "extraordinary and compelling reasons warrant . . . a reduction [in the defendant's sentence]," then determine whether "the defendant is . . . a danger to the safety of any other person or to the community," and finally assess whether a reduction in the defendant's sentence is consistent with the factors set forth in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13.

### B.    Extraordinary and Compelling Reasons for Release

Molley argues that there are two extraordinary and compelling reasons to release him from prison. (*See* Dkt. No. 77 at 4–16.) First, Molley claims that he could be reinfected with COVID-19. (*See id.* at 9, 13–16.) Second, he contends that FCI-Lompoc cannot adequately care for his previous infection because the prison cannot perform CT scans. (*See id.* at 12.) The Court concludes that neither the risk of reinfection nor the lack of CT scans at FCI-Lompoc are extraordinary and compelling reasons to release Molley from prison. Accordingly, the Court

finds that Molley is ineligible for compassionate release.

               1.     <u>Risk of Reinfection</u>

       The past few months have shown that prisons are a breeding ground for COVID-19. In the last month alone, the number of prison inmates known to have COVID-19 doubled to 68,000, and prison deaths tied to COVID-19 rose by 73 percent. *See* Timothy Williams *et al.*, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. Times https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html (last updated June 18, 2020). These startling statistics have led many courts, including this one, to hold that there are extraordinary and compelling reasons to release an inmate from prison if the inmate is at significant risk of severe complications from COVID-19. *See, e.g.*, *United States v. Pippin*, Case No. CR16-0266-JCC, Dkt. No. 122 at 4 (W.D. Wash. 2020). For such at-risk inmates, their continued incarceration creates a concrete and unacceptable risk of infection. *See Covid-19's Impact on People in Prison*, Equal Justice Initiative, https://eji.org/news/covid-19s-impact-on-people-in-prison/ (last updated May 21, 2020) ("Nationwide, the known infection rate for Covid-19 in jails and prisons is about 2½ times higher than in the general population.").

       Molley's case is different than those inmates. Whereas releasing uninfected inmates mitigates the concrete risk of them getting infected, releasing Molley would reduce the risk of him getting reinfected. That risk is—at least right now—speculative.[1] According to the Centers for Disease Control and Prevention ("CDC"), "We do not know to what degree or duration persons are protected against reinfection with SARS-Cov-2 following recovery from COVID illness." *Clinical Questions about COVID-19: Questions and Answers*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html (last updated June 4, 2020). People could be immune from reinfection entirely, partially, or not at all. *See* Paul Kellam & Wendy

---

[1] The Court's decision is based on society's present understanding of COVID-19. Should that understanding evolve and the risks of reinfection become more apparent, the Court will reevaluate whether those risks constitute an extraordinary and compelling reason to release inmates from prison.

Barclay, *The Dynamics of Humoral Immune Responses Following SARS-Cov-2 Infection and the Potential for Reinfection*, J. Gen. Virology, May 2020, at 1 (describing how immune responses to the six other human coronaviruses differ and observing that only some of those viruses have become endemic); Erin Garcia de Jesus, *New Data Suggest People Aren't Getting Reinfected with the Coronavirus*, Science News (May 19, 2020, 5:46 PM), https://www.sciencenews.org/article/coronavirus-covid19-reinfection-immune-response (describing a report from the Korean Centers for Disease Control and Prevention finding that supposedly reinfected patients were testing negative for the virus). In addition, a person's immunity could depend on whether they were asymptomatic during their first infection—or it could not. Apoorva Mandavilli, *You May Have Antibodies After Coronavirus Infection. But not for Long.*, N.Y. Times, https://www.nytimes.com/2020/06/18/health/coronavirus-antibodies.html (last updated June 20, 2020) (reporting on a study that found that certain sets of antibodies declined quicker in asymptomatic people while another set declined slower). What matters is that "[w]e do not know." CDC, *supra*.

This uncertainty cuts against compassionate release. Compassionate release is limited to "extraordinary and compelling reason[s]," 18 U.S.C. § 3582(c)(1)(A), and the party seeking release bears the burden of showing that those reasons exist, *see United States v. Greenhut*, 2020 WL 509385, slip op. at 1 (C.D. Cal. 2020) (citing *United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998)). Molley has not carried his burden. At most, Molley has shown that it is theoretically possible that he could get at least partially reinfected with COVID-19 at some point in the future.[2] That possibility is not the same as the concrete and serious threat that

---

[2] To support the assertion that "getting COVID-19 does not make people immune from getting it again," Molley cites to a *Bloomberg* news article from April 25, 2020. (*See* Dkt. No. 77 at 9) (citing Patrick Henry, *WHO Warns You May Catch Coronavirus More than Once*, Bloomberg, https://www.bloomberg.com/news/articles/2020-04-25/catching-covid-19-may-not-shield-against-new-infection-who-says (last updated April 25, 2020, 4:10 AM)). The article refers to the World Health Organization's statement that "[a]s of 24 April 2020, no study has evaluated whether the presence of antibodies to SARS-CoV-2 confers immunity to subsequent infection by this virus in humans." *"Immunity Passports" in the Context of COVID-19*, CDC (Apr. 24, 2020),

infection poses to at-risk inmates, and it is not an extraordinary and compelling reason to release Molley from prison.

2.      FCI-Lompoc's Ability to Care for Molley

Molley similarly fails to establish that the lack of CT scans at FCI-Lompoc is an extraordinary and compelling reason to release him from prison. To prove that such scans are scans are important, Molley cites to a single news article describing a study of nine patients with coronavirus pneumonia. (*See* Dkt. No. 77 at 12) (citing Matt O'Connor, *Chest X-ray May Overlook Coronavirus Cases Apparent on CT*, Health Imaging (Mar. 4, 2020), https://www.healthimaging.com/topics/diagnostic-imaging/chest-x-ray-miss-coronavirus-cases). The study found that X-rays detected abnormalities in three of the patient's lungs and that CT scans detected abnormalities in eight of the patient's lungs. O'Connor, *supra*. These findings led the study's authors to concluded that CT scans were better at "picking out infected individuals." *Id.* That quoted language is important: the authors appeared to focus on whether CT scans were superior to X-rays as a tool for *diagnosing* COVID-19, not treating it. *See id.* ("The study is the latest to confirm CT's superiority in detecting individuals with the virus.") Thus, the study does not prove that a CT scan is essential to treating Molley.[3] And because FCI-Lompoc appears able to treat Molley, at least given the record before the Court, there are not extraordinary and compelling reasons to release Molley from prison.

_____

https://www.who.int/news-room/commentaries/detail/immunity-passports-in-the-context-of-covid-19. The WHO's statement shows that society has a limited understanding about the risks of subsequent infection by COVID-19; the statement does not show that subsequent infection is likely or dangerous.

[3] It is worth considering the implications of Molley's argument. Molley has been asymptomatic for three months, and an X-ray revealed only minimal scarring to his lungs. (*See* Dkt. No. 78 at 77–78, 89.) If Molley is facially eligible for compassionate release because X-rays (and FCI-Lompoc's other diagnostic tools) are wholly inadequate for treating someone like Molley, then seemingly every currently and previously infected inmate at FCI-Lompoc would be similarly eligible for release. If the Court is to accept such an argument, the Court will need more evidence than a single news article about a study performed on 9 patients.

ORDER
CR15-0254-JCC
PAGE - 6

**III.    CONCLUSION**

For the foregoing reasons, the Court DENIES Molley's motion for compassionate release (Dkt. No. 77).

DATED this 29th day of June 2020.

John C. Coughenour
UNITED STATES DISTRICT JUDGE